UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAWRENCE PILLOW,

           Plaintiff,

      vs.

TROOPER JOSHUA HENRY,
LIEUTENANT RICHARD SANCHEZ,
and DETECTIVE PATRICK CECILE,

           Defendants.

_____/

Case No. 20-CV-11360

HON. GEORGE CARAM STEEH

OPINION AND ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 43 and 44)

In this civil rights case, plaintiff Lawrence Pillow alleges that

defendant officers violated his Fourth, Fourteenth and Fifth Amendment

rights by conducting a wrongful search, seizure and taking of his property.

Plaintiff also asserts state law claims of seizure and gross negligence. The

defendant officers are named in their official and individual capacities. (ECF

No. 36). Defendants Joshua Henry and Richard Sanchez are employed by

the City of Detroit Police Department.[1] Defendant Patrick Cecile is

_____

[1] Claims against the City of Detroit were dismissed with prejudice by stipulation of the
parties. (ECF No. 49)

employed by the Wayne State University Police Department.[2] The matter is

before the Court on defendants' motions for summary judgment under Fed.

R. Civ. P. 56(a).  Upon a careful review of the written submissions, the

Court deems it appropriate to render its decision without a hearing pursuant

to Local Rule 7.1(f)(2).  For the reasons set forth below, defendants'

motions for summary judgment are GRANTED.

<u>FACTUAL BACKGROUND</u>

In 2014, Lawrence Pillow purchased the property located at 9555

Chalmers in Detroit (the "Property"). The Property had previously operated

as a funeral parlor and Pillow hoped to restore and re-open it. Pillow

testified that before he acquired the Property it had sustained "quite a bit" of

damage due to vandalism and had been stripped of copper and mechanical

equipment. (Pillow dep. p. 98). At the time of his deposition, taken seven

years after he purchased the Property, Pillow was still doing renovations

and had not turned on any of the utilities. *Id*. at 99.

On August 22, 2018, a murder took place near the Property. The

murder was being investigated by the Detroit Police Department ("DPD")

Homicide Task Force ("Task Force"). The Task Force is a multi-agency unit

---

[2] Wayne State University Police Department is not an intended party to this case, as made clear in plaintiff's responsive pleading. (ECF No. 47, PageID.961)

that includes the Michigan State Police, Alcohol Tobacco and Firearms, the Federal Bureau of Investigation, the Drug Enforcement Agency and the Wayne State University Police Department. Defendant Henry described the chain of command as the Detective Sergeant of Due Process at the top, followed by the Michigan State Police Homicide Task Force commander and then Defendant Lieutenant Sanchez (Henry dep. p. 10).

Defendant Officer Cecile was the Officer in Charge ("OIC") of the homicide investigation. Cecile was employed as a Public Safety Officer with the Wayne State University Police Department and was on loan to the DPD and assigned to the Task Force in 2016. As the OIC, Cecile coordinated the investigation. While at the murder scene, Cecile observed video cameras on the Property. Pillow had installed the cameras on the exterior of the building to deter vandalism and theft after suffering repeated break-ins. *(*Pillow dep. p. 11). The cameras had wires attached to them and they appeared to be operational when viewed from the street. *Id.* at 11-12.

Cecile's attempts to contact the owner of the Property by knocking on the door as well as placing phone calls were unsuccessful. Cecile then requested that Henry obtain a search warrant. On August 23, Henry submitted an Application and Affidavit for a warrant to search the Property for video recordings that may have captured evidence related to the

murder. Wayne County Circuit Court Judge Margaret M. VanHouten approved the warrant. Pillow does not challenge the validity of the search warrant.

The search warrant was executed in the afternoon of August 23 by defendants and other Task Force members. After knocking and announcing their presence, the entry team used a hand-held battering ram to open the front door. The front door was damaged during this process, but it was still on its hinges. The entry team then proceeded to secure the location.

Pillow arrived at the Property during the execution of the search warrant after neighbors alerted him that the police had entered his Property. He was visibly upset about his front door being broken. Henry gave Pillow a copy of the search warrant and other officers directed him to Sanchez as the supervisor. Sanchez explained they were looking for footage from the video cameras. Pillow told him the cameras were not operational and there was no video. Sanchez gave Pillow information to request reimbursement from the City of Detroit for the damage done to the front door. The search ultimately revealed that there were no video recording or storage devices found and the cameras were not operational.

Pillow contends that he entered the Property during the execution of the search warrant and saw officers throwing boxes around and breaking tiles. (Pillow dep. pp. 27, 31). He also claims that eight interior doors were broken although they had not been locked and had no reason to be damaged. *Id*. at 45, 49, 50. He contends that damage was done to an antique organ, a piano, a casket, toilet bowls, desks, the attic door and stairs, a lamp, and that a box of funeral flags was missing altogether. *Id*. at 51-71. Pillow also alleges that items were taken from his Property later that night because the front door sustained damage and was no longer able to be locked.

At his deposition, Pillow testified that because of this incident he suffers depression, hypertension and high blood pressure. *Id*. at 74-75. He contends that he can no longer perform his work as a truck driver because he cannot pass the physical examination. *Id*. at 76. However, medical records from February 2020 indicate Pillow does not have, and has never had, high blood pressure, anxiety, depression, nervousness or other mental health problems. (ECF No. 44-9, PageID.938).

Defendants each described the condition of the Property when they first entered as being in a state of general disrepair. According to Cecile, "the rooms were tight and messy with lots of things strewn about." (Cecile

Aff'd ¶ 20). Lt. Sanchez testified that when he entered the Property "[i]t looked like it was under construction and disarray." (Sanchez dep. p. 29). Henry testified, "[t]here was garbage and debris all about the whole entire property, there were certain rooms we really couldn't even get into because of the amount of items that were just thrown about in there. It was not a well-kept or maintained property whatsoever." (Henry dep. p. 41).

Other than damaging the front door upon entry, each defendant denies causing damage to the Property and states they did not witness any other officer do damage to anything inside the building or take anything out of the building. (Sanchez dep. pp. 29-30; Henry dep. pp. 24, 41; Cecile Aff'd ¶ 22). Pictures are routinely taken before and after a search warrant is executed to document the condition of the property. (Sanchez dep. p. 24). In this case, pictures were taken but they could not be found in the homicide file, where they are routinely stored. *Id.* at 11, 24. Pillow did not have any pictures of the Property taken before the search and the pictures he produced during discovery fail to show the damage he alleges resulted from execution of the search warrant by defendants. In fact, many of the pictures Pillow produced were from other properties altogether.

Pillow clearly testified at his deposition that he did not observe the defendants, or anyone else, cause any of the damage alleged, or remove any of the items alleged.

<u>STANDARD FOR SUMMARY JUDGMENT</u>

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Tolan v.* Cotton, 572 U.S. 650, 660 (2014); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties

- 7 -

will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## ANALYSIS

### I.   Official Capacity Claims

Plaintiff's Second Amended Complaint names the defendant officers in their individual and official capacities. "A suit against an individual in his

- 8 -

official capacity is the equivalent of a suit against the governmental entity."
*Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). "As long as the
governmental entity receives notice and an opportunity to respond, an
official-capacity suit 'imposes liability on the entity that he represents.'"
*Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (quoting *Brandon v. Holt,*
469 U.S. 464, 471–72 (1985)). Plaintiff named the City of Detroit as a
defendant along with the individual officers, but plaintiff later dismissed his
claims against the City of Detroit (ECF No. 49). Plaintiff also made clear in
his responsive pleading that he is not asserting claims against Cecile's
governmental entity employer, Wayne State University. (ECF No. 47,
PageID.961). Because the Court treats official capacity claims as claims
against the entity itself, and those entities are not intended to be parties to
this action, plaintiff does not bring a valid official capacity claim against the
individual defendants. *See Miller v. Calhoun County,* 408 F.3d 803, 817
(6th Cir. 2005) ("Accordingly, as it appears that [defendants] are being sued
in their official capacities, we treat the claims against them as being claims
against the County.")  Therefore, the claims made against the defendants
in their official capacities are dismissed.

II.   <u>Section 1983 – Constitutional Violations</u>

    A.   <u>Qualified Immunity - Standard</u>

Qualified immunity is a defense that shields officials from civil liability if their conduct "does not violate clearly established rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Everson v. Leis*, 556 F.3d 484, 493 (6th Cir. 2009). Qualified immunity is a legal question for the court to resolve. *Elder v. Holloway,* 510 U.S. 510, 516 (1994); *Tucker v. City of Richmond,* 388 F.3d 216, 219 (6th Cir.2004). In determining whether a defendant is entitled to qualified immunity, the court analyzes (1) whether, considering the allegations in the light most favorable to the party injured, the officer's conduct violated a constitutional right, and (2) whether that right was clearly established. *Richmond v. Huq*, 885 F.3d 928, 947 (6th Cir. 2018) (citation omitted).

When a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. After a summary judgment motion is filed, a plaintiff can no longer rely on allegations made in the complaint. Rather, they must set forth specific facts showing there is a genuine issue of material fact for trial. *Skousen v. Brighton High Sch.*, 305 F.3d 520, 527 (6th Cir. 2002). To

establish a liability under § 1983, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011). In other words, each defendant must be "personally involved" in the unconstitutional action. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

Vicarious liability is inapplicable to § 1983 suits, such that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Consequently, "[a] plaintiff must therefore show how each defendant 'directly participated in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself.'" *Gardner v. Evans*, 920 F.3d 1038, 1051 (6th Cir. 2019) (quoting *Flagg v City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013)).

B.    Fourth Amendment Illegal Search and Seizure

Generally, officers are "entitled to rely on a judicially secured warrant for immunity from a § 1983 action for illegal search and seizure." *Yancey v. Carroll Cnty., Ky.*, 876 F.2d 1238, 1243 (6th Cir. 1989) (citing *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986)). In this case plaintiff does not challenge that probable cause existed for the issuance of the search

warrant, nor did he observe any of the three defendant officers act outside the scope of the search warrant. Furthermore, plaintiff clearly testified that he did not see anyone cause damage to anything inside the Property, nor did he see anyone take anything from the Property. (Pillow dep. pp. 30-31, 52-53, 56-60, 62, 63, 67, 69-74, 83-86, 91-92, 101, 104).

Rather, plaintiff maintains that because the defendant officers were on the scene during the search, they were liable for any damage that occurred during the execution of the search warrant. Plaintiff has offered no evidence that any of the individual officers personally damaged or stole any of the various items plaintiff refers to in his complaint or deposition.

Plaintiff cites to the Sixth Circuit's decision in *Hill v. McIntyre*, 884 F.2d 271 (1989) as setting the standard of reasonableness for searches causing excessive damage to property. The court held that in a § 1983 action, the district court must determine not whether destruction was "reasonably necessary to effectively execute a search warrant" but whether the plaintiff has raised factual issues to be submitted to the jury on this point. *Id.* at 278 (quoting *Tarpley v. Greene*, 684 F.2d 1, 9 (D.C.Cir.1982)). In *Hill*, the plaintiffs and defendants testified in opposition about the condition of the house before the search took place. Photographs and even one officer's testimony supported a finding that plaintiffs raised a factual

issue as to the reasonableness of the destruction committed in their home. *Id.* (the officer "testified that he sensed soon after entering that the house did not appear to be a drug house, yet he permitted the destruction to continue for thirty minutes to an hour before heeding Alicia Hill --whom he then considered to be trustworthy --that the drug house was next door.")

In this case, there is no evidence to support plaintiff's allegations of damage to the Property, other than the admitted damage done to the front door upon entry. The most plaintiff saw was other officers dumping items from boxes and desk drawers as they executed the search, but this does not support his claims. Plaintiff provides no evidence from which a jury could reasonably conclude that defendants caused the claimed damages to the roof and pillars, organ, piano, casket, ladder, toilets, doors, desks, windows, and lamp. Some photographs provided by plaintiff in discovery show floors, ceilings, pillars and a roof in a state of general disrepair. This is consistent with testimony from both sides that the property was in disrepair and was undergoing renovations. Other photographs show holes in walls and items piled up in rooms. However, at plaintiff's deposition, he admitted that many of these photographs were from properties other than the one involved in this case. (Pillow dep. pp. 78, 80, 90).

Plaintiff testified that the damage to the roof and pillars was caused by the police using a firetruck to remove the front door. Ultimately, however, plaintiff seems to agree that a battering ram was used to open the front door. (ECF No. 48, PageID.1093). There is no evidence to support a reasonable conclusion that the defendants, even by using a battering ram to open the front door, could have caused the damage claimed to the roof or pillars.

Regarding his health, plaintiff provided medical documentation showing that he never had the conditions he identified at his deposition. (ECF No. 44-9, PageID.938). The medical record was signed and certified by plaintiff on February 24, 2020 as "accurate and complete." Therefore, plaintiff's own evidence demonstrates that he met the federal standards related to medical for a commercial driver's license.

Viewing the record before the Court as a whole, there is not a genuine issue of material fact for trial. The Court finds that defendants are immune from suit with regard to plaintiff's Fourth Amendment illegal search and seizure claim.

C.    Fifth Amendment Taking Claim

As it relates to the items that were allegedly taken from the Property, plaintiff places the responsibility on defendants because they damaged the

front door such that the Property could not be secured against intruders. Courts cannot hear takings clause claims unless the property owner has been denied a remedy. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 721 (1999). Here, plaintiff submitted a claim for property damage to the City of Detroit. (ECF No. 44-5, PageID.862). Plaintiff's claim form stated that the "doors" needed to be replaced and included a list of additional damaged and missing items for which he was seeking recovery. The claim form directs a claimant to include two estimates for damages, but plaintiff only included one quote to replace nine doors for $12,668. The total of the alleged damages submitted on the claim form was $45,778. No quotes were provided for any of the other damages listed.

First, the City offered to pay $2,500 for the uncontested damage to the front door, but plaintiff declined to take the offer. Plaintiff cannot now bring a § 1983 claim for damages to the front door because he was offered a remedy. To the extent he does not believe that remedy to be fair, plaintiff failed to provide two estimates for the alleged damages as required, so he failed to properly use the process that was provided to him.[3]

---

[3] It also appears that the claim form was submitted more than 45 days from the date the damage was incurred, making the claim untimely. (ECF No. 44-5, PageID.862).

Second, plaintiff admits he did not observe defendants committing the alleged takings, nor does he even allege that they took anything from the Property. There being no factual issue for trial, defendants are entitled to qualified immunity on the Fifth Amendment claim.

D.     Failure to Intervene

To prevail on a failure to intervene claim, plaintiff must show that the defendants (1) observed or had reason to know that constitutional harm would occur; and (2) had the opportunity and means to prevent it. *Sheffey v. City of Covington*, 564 Fed. Appx. 783, 793 (6th Cir. 2014). Plaintiff has not plead, nor has he identified any evidence to support, that any of the defendants observed or had reason to know of allegedly unconstitutional conduct and had the opportunity and means to prevent such conduct. Instead, plaintiff merely testified that defendants were present and/or were in charge during the search, so they are responsible for everything that allegedly occurred during the search. Plaintiff's failure to intervene claim against the defendant officers cannot survive and will be dismissed.

III.   State Law Violation of Duty of Care

Count II of the Second Amended Complaint asserts that defendants violated their duty of care under state law by failing to act in good faith while searching plaintiff's property in an unreasonable manner outside the

scope of the search warrant. Lower level governmental employees are immune from intentional tort liability when they are:

(1)     acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority;

(2)     acting in good faith; and

(3)     performing discretionary, as opposed to ministerial acts.

*Odom v. Wayne County*, 482 Mich. 459, 473-76 (2008) (citing *Ross v. Consumers Power Co. (on Rehearing)*, 420 Mich. 567, 633, 634 (1984)).

In executing a valid search warrant, the defendants were acting in the course of their employment and within the scope of their authority for purposes of the first element. There is no evidence to support a genuine issue of material fact that defendants were acting in good faith. They provided plaintiff with a copy of the search warrant as well as information so he could make a claim for the damage to his front door. As previously discussed, there is no evidence that any of the defendants damaged any property or knowingly stood by while another officer did so. Therefore, the second element is also met.

The third element requires that the act performed be discretionary as opposed to ministerial. A ministerial act involves "merely an obedience to orders or the performance of a duty in which the individual has little or no

choice." *Odom*, 482 Mich. at 476. Examples of ministerial acts include "completing activity logs and police reports or following the procedures for booking an arrested person. *Id*. Discretionary acts, however, "require personal deliberation, decision, and judgment." *Id*. Determining "whether there is reasonable suspicion to investigate or probable cause to arrest and to determine the amount of force necessary to effectuate an arrest" are examples of discretionary acts. *Id*.

The execution of a search warrant involves considerable discretion in terms of how to conduct the search, what efforts to undertake to effectuate the search, and judgment in determining when to conclude the search. Indeed, courts have reasoned that the execution of a search warrant requires discretion. *See Gordon v. Louisville-Jefferson County Metro Govt.*, 3:08-CV-00029, 2011 WL 777939, at *5 (W.D. Ky. Feb. 28, 2011), *aff'd sub nom. Gordon v. Louisville/Jefferson County Metro Govt.*, 486 Fed. Appx. 534 (6th Cir. 2012) (unpublished) (citing *Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995)). The third element is clearly met in this case.

Defendants have qualified immunity from intentional tort liability as alleged in Count II.

IV.   Gross Negligence

Plaintiff alleges that the defendants owed him a duty of care to properly execute the search warrant, investigate and supervise other officers. Plaintiff maintains that defendants were grossly negligent in executing their duties in this case.

There is no claim for ordinary negligence under Michigan law against government employees. Mich. Comp. Laws § 691.1401, *et seq*. Therefore, defendants will not be liable unless plaintiff can show gross negligence, which is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8)(a). The conduct must not only be "the proximate cause of the injury or damage," Mich. Comp. Laws § 691.1407(2)(c), it "must be *the* most immediate cause of a plaintiff's injuries." *Tarlea v. Crabtree*, 263 Mich. App. 80, 92 (2004).

Plaintiff has alleged no facts nor presented any evidence that rises to the level of conduct by defendants that was so reckless as to demonstrate a lack of concern for whether an injury resulted from the search. Similarly, plaintiff cannot show that defendants were the proximate cause of any damage inflicted by others. The Court finds that defendants are protected by governmental immunity against plaintiff's claim of gross negligence.

## CONCLUSION

Now, therefore, for the reasons stated in this opinion and order,

IT IS HEREBY ORDERED that defendants' motions for summary

judgment (ECF Nos. 43 and 44) are GRANTED.

Dated:  August 25, 2021

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 25, 2021, by electronic and/or ordinary mail.

s/Brianna Sauve
Deputy Clerk
